IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS,
AUSTIN DIVISION

| | | |
|---|---|---|
| David McMahon, Steven Littlefield, | § | |
| And the Texas Division, | § | |
| Sons of Confederate Veterans, Inc., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 1:17:CV-0822-LY |
| | § | |
| Gregory L. Fenves, | § | |
| In His Official Capacity as | § | |
| President of | § | |
| The University of Texas at Austin, | § | |
| Defendant. | § | |

PLAINTIFF'S FIRST AMENDED COMPLAINT,
APPLICATION FOR INJUNCTIVE RELIEF, &
MOTION FOR DECLARATORY JUDGMENT

## A. PARTIES

1.    Plaintiff, David McMahon, is a citizen of the State of Texas, a resident taxpayer of the State of Texas, and a descendant of Confederate veterans.

2.    Plaintiff, Steven Littlefield, is a citizen of the State of Montana, and a descendant of Confederate veterans, including Maj. George Washington Littlefield.

3.    Plaintiff, Texas Division, Sons of Confederate Veterans, Inc., is a non-profit corporation that is organized under the laws of the State of Texas.

4.     Defendant, Gregory L. Fenves, is an officer of the University of Texas at Austin and is being sued in his official capacity.  He may be served by serving the Office of the President.  *See* Fed. R. Civ. P. 4(j)(2)(A).

## B. JURISDICTION

5.     The Court has jurisdiction over the lawsuit, because the suit arises under Amendment I of the U.S. Constitution.  "Congress shall make no law . . . abridging the freedom of speech.". . .  *See* 28 U.S.C. § 1331; *Gunn v. Minton*, 133 S.Ct. 1059, 1064 (2013); *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005).

6.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiffs' claims for breach of the Littlefield Bequest, violation of the Texas Monument Protection Act, and violation of Board of Regents' authority, because plaintiffs' claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.  The removal of the Littlefield Monuments gives rise to the abridgment of the constitutional guarantee of free speech.  Since the state claims and the federal claim arise from the same nucleus of facts, the removal of the Monuments, supplemental jurisdiction over the state claims is proper.  *Exxon Mobil*, 545 U.S. at 558; *see City of Chicago v. International Coll. of Surgeons*, 522 U.S. 156, 167 (1997).

7.     This action is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, which provides redress to persons who have been deprived of

their civil rights under color of state law, and under 28 U.S.C. § 1331 and § 1343(a)(3)(4). These provisions confer jurisdiction on this Court to adjudicate violations of federal civil-rights acts and applicable provisions of the U.S. Constitution.

8.     The Court has authority to grant declaratory relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Remedies are available under 42 U.S.C. § 1983.

## C. VENUE

9.     Venue is proper in this district under 28 U.S.C. § 1391(B)(2), because all of the events or omissions giving rise to this claim occurred in this district and because all of the property at issue is situated in this district. The Littlefield Statues at the University of Texas at Austin are located in this district, and defendant's actions occurred in this district when he ordered the unlawful and unconstitutional removal of the Littlefield Statues and covered the inscriptions on their plinths. Venue also lies under 28 U.S.C. § 1400(a), because defendant resides or may be found in this district.

## D. FACTS

10.     In the early morning hours of Monday, August 21, 2017, President Fenves had four statues of famous statesman removed from the South Mall of the University of Texas at Austin and their supporting plinths covered with black plastic in order to obscure their ancient inscriptions. Jonah Engel Bromwich, *University of Texas at Austin Removes Confederate*

*Statues in Overnight Operation*, NYTIMES.COM (Aug 21, 2017), https://www.nytimes.com/2017/08/21/us/texas-austin-confederate-statues.html.

11.     The statues were paid for and donated to the University by Maj. George Washington Littlefield, a major donor to the University. The statues were part of a monument complex that Maj. Littlefield donated to the University and that the University received with great fanfare. *Task Force on Historical Representation of Statuary at UT Austin*, UTEXAS.EDU at 11 (last visited September 19, 2017). President Fenves is now disassembling the Littlefield Monuments piecemeal.

12.     The Littlefield Bequest included the Littlefield Statues, the Littlefield Fountain, funds for an endowed chair in American history, the Littlefield Fund for Southern History, a fund for the publication of a history of the United States from the Southern perspective, the Littlefield Dormitory for Women, the Littlefield Mansion, tracts of land that the University expanded into in the 1920s, the seed funds for six classroom buildings, and the seed money for the Texas Tower and Administration Building. The Littlefield Bequest provided the assets for the University as a major national university. *Id.* at 12; Will 2-5, 20, 23, 25-26 (Exhibit A).

13.     In return for Maj. Littlefield's remarkable generosity, he requested, simply, that the University promote the Southern perspective of American history. *Id.* The University agreed, yet it has never in ninety-

seven years fulfilled all the terms of the Littlefield Bequest while accepting all of the Bequest's assets.  Now, the University has repudiated the Bequest term that George Washington Littlefield declared the most significant:  the statues of the Littlefield Memorial.  Will at 4 (Exhibit A).

### E.  PLAINTIFFS' CLAIMS

### COUNT 1 – ABRIDGEMENT OF FREE SPEECH

14.     A bedrock principle of the First Amendment is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); U.S. Const. amend. I.; *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 577 (1991) ("Where the government prohibits conduct *precisely because of its communicative attributes*, we hold the regulation unconstitutional.") (Scalia J., concurring).

15.     A significant exception to the right to free speech is found in the government-speech doctrine.  *Pleasant Grove City, Utah, v. Summum*, 555 U.S. 460, 460 (2009).  Here, the court held that a government actor "is entitled to say what it wishes and to select the views that it wants to express." *Id.*  "The placement of a permanent monument in a public park is a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause." *Id.*  The government-speech doctrine is an absolute defense to First Amendment challenges, and an unwise one at that.  *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 571 (2005) (Souter, J.,

dissenting). Unchecked expansion of the government-speech doctrine threatens to erode constitutional protections by allowing viewpoint discrimination in an increasingly wide range. *Developments in the Law— State Action and the Public/Private Distinction*, 123 HARV. L. REV. 1248, 1293 (2010).

16. One significant area of exemption from the government-speech doctrine is where government funds speech through subsidies in order to promote diversity.[1] The U.S. Supreme Court in its first government-speech case took pains to acknowledge that the government may not discriminate against government-subsidized activities solely on the basis of viewpoint. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

17. In like manner, the government cannot make viewpoint restrictions of speech, even in unprotected forms of speech, such as libel. *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 383-84 (1992).

> [T]hese areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content. Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government.

*R.A.V.*, 505 U.S. at 383-84.

---

[1] Another exemption, the Establishment-Clause exemption, is discussed in some detail in *Summum*. 555 U.S. at 460; *see* Scalia concurrence. *See also R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, FN 4 (1992). This exemption is not in controversy in this matter.

> That would mean that a city council could enact an ordinance prohibiting only those legally obscene works that contain criticism of the city government or, indeed, that do not include endorsement of the city government. Such a simplistic, all-or-nothing approach to First Amendment protection is at odds with common sense and with our jurisprudence as well.

*R.A.V.*, 505 U.S. at 384.[2]

18.    The prohibition against viewpoint discrimination holds true for government speech in a limited public forum. *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 833 (1995). "[W]hen the State is the speaker, it may make content-based choices. . . . We recognized that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Id.* "It does not follow, however, and we did not suggest in *Widmar*, that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 834.

> [W]e reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits by observing that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to "aim at the suppression of dangerous ideas." (citations omitted).

*Rosenberger*, 515 U.S. at 834. In other words, when the government provides subsidies to support diversity of viewpoint, the government must maintain viewpoint neutrality in the provision of such subsidies.

---

[2]  Justice White asserts that the prohibition against government burdening of speech content critical of government is not a First Amendment consequence, but rather a consequence of the Equal Protection Clause. *R.A.V.*, 505 U.S. at n. 4.

19.    The prohibition on viewpoint discrimination serves to bar the government from skewing public debate. *Id.* at 894. (Souter, J., dissenting). "It is precisely this element of taking sides in a public debate that identifies viewpoint discrimination and makes it the most pernicious of all distinctions based on content." *Id.* at 895.

20.    The *Rosenberger* court concerns itself with the prohibition of viewpoint discrimination in government speech in a limited public forum. *Id.* at 819. *National Endowment of Arts v. Finley* inquires into the prohibition of viewpoint discrimination in government speech in a government forum. 524 U.S. 569 (1998).[3]

21.    A government actor in a government forum, such as the National Endowment for the Arts (NEA), may not leverage its power to award subsidies by subjective criteria to penalize disfavored viewpoints. *Id.* at 587-88. Indeed, works of art are unquestionably shielded by First Amendment protection. *Id.* at 602. (Souter, J., dissenting).

> The constitutional protection of artistic works turns not on the political significance that may be attributable to such productions, though they may indeed comment on the political, but simply on their expressive character, which falls within a spectrum of protected speech extending outward from the core of overtly political declarations. Put differently, art is entitled to full protections because our "cultural life," just like our native politics, "rest upon [the] ideal" of governmental viewpoint neutrality.

---

[3] *Pleasant Grove City, Utah, v. Summum*, 555 U.S. 460 (2009) does not inquire into subsidies in relation to government speech, nor into the requirement that the government many not provide subsidies to promote diversity of viewpoint in any forum and exercise viewpoint discrimination.

*National Endowment for the Arts*, 524 U.S. at 602-03.

22.   Government may not discriminate on viewpoint, when government expends funds to encourage diversity of viewpoint from private speakers. *Id.* at 613 (quoting *Rosenberger*, 515 U.S. at 834). "When the government acts as patron, subsidizing expression of others, it may not prefer one lawfully stated view over another." *Id.*

> So long as Congress chooses to subsidize expressive endeavors at large, it has no business requiring the NEA to turn down funding applications of artists and exhibitors who devote their "freedom of thought, imagination, and inquiry" to defying our tastes, our beliefs, or our values. It may not use the NEA's purse to "suppress dangerous ideas."

*National Endowment for the Arts*, 524 U.S. at 613-14 (quoting *Regan v. Taxation with Representation for Wash.*, 461 U.S. 540, 548 (1983)).

23.    The University of Texas at Austin's public art collection is controlled by the Public Art Master Plan. *Handbook of Operating Procedures:   Art   in   Public   Spaces*, POLICIES.UTEXAS.EDU at IV, https://policies.utexas.edu/policies/art-public-spaces (last visited September 19, 2017). The Public Art Master Plan includes all the Littlefield Monuments in the Plan's master inventory. *The University of Texas at Austin Public Art Master   Plan   (Landmarks)*, LANDMARKS.UTEXAS.EDU   at   7, https://landmarks.utexas.edu/sites/files/landmarks/Landmarks_Public_Art_Master_Plan.pdf (last visited September 19, 2017).

24.     The University acknowledges that diversity is central to the consideration of its public art collection and the Littlefield Monuments in particular. *Id.* at 4.   Landmarks states:

> ART AND DIVERSITY ON CAMPUS
> There is a general perception that the figurative bronze sculptures on campus convey difficult and sometimes contentious messages about diversity in the university, both in terms of the individuals commemorated and the locations of the statues within the built environment.  In particular, the Confederate statues on the South Mall are a source of controversy; their subject matter and their location are often invoked with issues of racial diversity and tolerance arise. . . .
>
> Future commemorative projects should be mindful of the traditions that gave rise to the production of bronze figural sculpture, and they should seek forms of artistic expression that are as diverse and relevant as the ideals they wish to convey.

*Public Art Master Plan* at 4.

25.     The University's own remedy to the disfavored political viewpoint communicated in the statues is to create greater diversity, not less. *Id.*   The University's public art program, that expressly includes the Confederate and Non-Confederate Littlefield Monuments, uses diversity as an essential attribute in the establishment of new public art.  *How Is Public Art Funded and Approved?*, LANDMARKS.UTEXAS.EDU, https://landmarks.utexas.edu/about-landmarks (last viewed September 19, 2012).  The University subsidizes acquisitions with grants and existing works with maintenance.

26.     The President's Task Force made extensive comments that the Littlefield Monuments engendered controversy and political speech that

many people found repugnant. *Task Force* at 11-14; *President Fenves'*
*Decision    on    UT    Austin    Statuary*,    PRESIDENT.UTEXAS.EDU,
https://president.utexas.edu/messages/statuary (last visited September 19,
2017). [4]   The University has expressly stated that its sole basis for the
removal of the Monuments was the political viewpoints communicated by the
Monuments. *Id.*

27.    The University is exercising viewpoint discrimination against
works of public art, that the University accepted and has been subsidizing,
and that were designed and agreed to communicate controversial political
viewpoints.    Andrew Weber, *The Long, Controversial History of UT's*
*Confederate Statues*, KUT (Aug. 12, 2015), www.kut.org.

28.    The First Amendment presumptively ·restrains viewpoint
discrimination by a state actor. *National Endowment*, 524 U.S. at 616;
*Simon & Schuster, Inc. v. Members of New York State Crime Victim Bd.*, 502
U.S. 105, 116 (1991).  Since the presumption favors First-Amendment rights,
the University has the burden to explain how these Monuments communicate
these imputed messages that are so remote from the Monument founders'
published statements. *National Endowment*, 524 U.S. at 616.

29.   But even if President Fenves is correct in his understanding as to
the controversial and repugnant political messages that emanate from these

_____

[4]   President Fenves announced in this statement that the other four removed statues would
stay, because of Jim Hogg's, Albert Sidney Johnston's, and John Reagan's deep ties to Texas,
and Robert E. Lee's legacy to Texas.  *President Fenves' Decision on UT Austin Statuary*,
PRESIDENT.UTEXAS.EDU,  https://president.utexas.edu/messages/statuary  (last  visited
September 19, 2017).

works of public art, the University is prohibited from disfavoring or impairing minority political viewpoints that they have subsidized and called forth through the University's invitation for diversity in art projects. *Id.* at 613-14; *see also Regan,* 461 U.S. at 548. The core constitutional issue as to why a state actor may not favor political viewpoints when the actor has subsidized and requested a diversity of viewpoints is that the state has opened the door to political discussion and cannot thereafter favor or disfavor one political viewpoint over another, especially when the state actor has agreed to display the controversial viewpoint. Indeed, the state must protect dangerous or dissenting viewpoints, especially in works of public art that a state actor subsidizes to express disfavored and outrageous viewpoints. *Id.* The unchecked expansion of the government-speech doctrine into the realm of public art, expressly subsidized to project diversity of expression and viewpoint, chills free speech when the state actor picks which viewpoints it will tolerate and which not. And this is even more true, when the University suddenly, secretly, and contrary to published assurance, strikes down dissenting minority speech in the dead of night. The Court should strike down this unchecked and unconstitutional expansion of government-speech into state-subsidized fora celebrating diversity of viewpoint and in public works of art in order to prevent government control of traditional areas of free thought and expression.

## COUNT 2 – BREACH OF BEQUEST AGREEMENT

30.     The University violated terms of the Littlefield Bequest, through waste, neglect, and express repudiation.  Accordingly, the University should be required to disgorge the funds provided by Maj. Littlefield some ninety-seven years ago to plaintiff Littlefield of the Littlefield Estate in restitution for breach of the Bequest's terms to avoid unjust enrichment, or promptly return all statues and structures where Maj. Littlefield, sculptor Pompeo Coppini, and architect Paul Cret intended the statues to be, in a place of prominence on the South Mall, and to maintain all terms of the Bequest with due care in perpetuity.

31.     The character of a testamentary gift must be determined using the law as it existed when the will was executed.

> The difficult task of determining what interest the testator intended to devise is the province of the court.  In resolving a controversy relating to the estate, interest, or amount passing under a particular devise or bequest, the court will consider the general scheme of the instrument in question, the provisions regulation descent and distribution, *the law as it existed when the will was executed*, the rights and property of the testator, and his or her knowledge regarding the persons who were objects of his or her bounty in addition to the rules governing the interpretation of wills generally.  (emphasis added)

74 Texas Jurisprudence 3d *Wills* § 279 (2014); *see Haupt v. Michealis*, 231 S.W. 706, 709 (Tex. 1921).

32.     With respect to the subject matter of a testamentary gift, the plain language of the instrument in question should be given a construction that most nearly comports with the intention of the testator as expressed in

the instrument as a whole.  "In construing a will[,] all its provisions should be looked to for the purpose of ascertaining what the real intention of the testatrix was[,] and, if this can be ascertained from the language of the instrument, . . . any particular paragraph of the will, which, considered alone, would indicate a contrary intent must yield to the intention manifested by the whole." *Lindsey v. Rose*, 175 S.W. 829, 831-32 (Tex. 1915); *Lane v. Sherrill*, 614 S.W.2d 623, 619 (Tex. App.—Austin 1981, no pet.); *see Perfect Union Lodge v. Interfirst Bank of San* Antonio, 748 S.W.2d 218, 220-24 (Tex. 1988) (citing *Dulin v.* Moore, 70 S.W. 742, 742-43 (Tex. 1902) (where plain language of will provides express intention of testatrix, court must give effect to intention unless prohibited by law)); see *also In re Walker Estate*, No. 13-11-00438 CV (Tex. App.——Corpus Christi-Edinburg August 23, 2012, no pet.) (mem.op.) (citing *McMurray v. Stanley*, 6 S.W. 412, 415 (Tex. 1887) (presumed intention of testator ought never be given controlling effect, where, by clear language of will testator by his own language has made intention clear)).

33.   A bequest is "a gift by will of personal property; a legacy." Black's Law Dictionary 128 (2d ed. 1910).  A specific bequest is "one whereby the testator gives to the legatee all of his property of a certain class or kind; as all his pure personalty." *Id.* The second edition of Black's Law Dictionary does not recognize the term "charitable bequest," nor "charitable trust," although the dictionary recognizes over twenty other kinds of trusts.

34.     Three elements are necessary to create a trust. *McMurray*, 69
S.W. at 415. "First, that the words of the testator ought to be construed as
imperative, and hence imposing on the trustee an obligation; secondly, that
the subject to which the obligation relates must be certain; thirdly, that the
person intended to be the beneficiary under the trust be also certain." *Id.* In
*Dulin,* the testatrix expressed in her plain language that she was imposing
an obligation to receive and control property by a trustee. "I hereby appoint
R. R. Dulin, of Sherman, Texas, trustee to receive and control the property
bequeathed and devised to the children of A. B. Moore, and Martha Laura
Steedman, by me." 70 S.W. at 742. The trustee was obliged with a certain
object, the property bequeathed to A.B. Moore and Martha Laura Steedman.
*Id.* The intended beneficiaries are certain: A.B. Moore and Martha Laura
Steedman. The three elements for the creation of a trust are satisfied. *Id.* at
743.

35.     On November 22, 1920, Maj. George W. Littlefield made a
testamentary gift of $250,000.00 to the University of Texas (UT) for the
commission and installation of a South Gateway to the campus in Austin.
Will at 3 (Exhibit A).

The plain language of the Littlefield Will provides:

I give and direct my executors hereinafter named to pay to Will
C. Hogg of Houston, Texas, H. A. Wroe, of Austin, Texas, and the
person who occupies the position of President of the University of
Texas as trustees the sum of two hundred thousand dollars
($200,000.00) said committee to use said sum or so much thereof
as may be necessary to erect a massive bronze arch over the

south entrance to the campus of the University of Texas, in Austin, Texas.[5]

Will at 3 (Exhibit A).

36.    In this language, Maj. Littlefield creates an obligation in trustees.   Trustees Will C. Hogg, H. A. Wroe, and the President of the University of Texas must erect a monumental bronze arch over the south entrance to the University.[6]   *Id.*   This satisfies the first element for the creation of a trust, the creation of an obligation on the trustee.

37.    Maj. Littlefield created a certain subject, which the obligation relates to, namely the commissioning of the massive bronze arch and monuments to Confederate heroes.   *Id.*   This satisfies the second element for the creation of a trust, the naming of a certain subject for the obligation.

38.    However, Maj. Littlefield did not name a certain intended beneficiary as the object of his bounty.   Because Maj. Littlefield did not name a certain intended beneficiary for a trust, the terms of the trust must fail. *McMurray*, 69 S.W. at 415; *Dulin*, 70 S.W. at 742.   Maj. Littlefield did not create a trust.

39.    The language of the Littlefield Will most nearly comports with the creation of a testamentary bequest.   Maj. Littlefield made a testamentary gift of personal property in the amount of $250,000.00 to the University of

---

[5]  Maj. Littlefield continues with lengthy and detailed directions for the commission and installation of the statues now sited on the South Mall as intended in the Will.  3 (Exhibit A).
[6]  UT eventually created the Littlefield Fountain and the accompanying statues leading up the Main Building, which modification of design was contemplated in the Littlefield Will and allowable, "giving prominence however to the statues of the men named above."  Will at 4 (Exhibit A).

Texas for the design and construction of a grand memorial arch.  Will at 3 (Exhibit A).    The $250,000.00 was Littlefield's personal property and, therefore, a bequest.

40.    In contrast, the Littlefield conveyance is more than likely not a gift, because a gift is "a voluntary conveyance of land, or transfer of goods, from one person to another, made gratuitously, and not upon any consideration of blood or money."  Black's Law Dictionary 540 (2d. ed. 1910). The Littlefield conveyance is not from one person to another person, nor is it a transfer of land, nor of goods, nor for any consideration.   Since these requirements of a gift are not met, the Littlefield conveyance cannot be said to be a gift.

41.    Maj. Littlefield uses both terms "gift" and "trust" in his Will. Given the law, extant at the time of Maj. Littlefield's execution of his Will, the conveyances are most plausibly construed as bequests and not trusts, because testator did not provide an express beneficiary to create a trust and the conveyance does not meet the test for a testamentary gift.

42.    One may not at the same time take under a will and claim adversely under it.  *Hodge v. Ellis*, 277 S.W.2d 900, 908-09 (Tex. 1955); *see Edsall v. Hutchings*, 143 S.W.2d 700, 703 (Tex. Civ. App.—Eastland 1940, no writ) (quoting *Dakan v. Dakan*, 83 S.W.2d 620, 624 (Tex. 1935)):

> [A]n election under a will is defined in the following language: "Election is the obligation imposed upon a party to choose between two inconsistent or alternative rights or claims in cases where there is a clear intention of the person from whom he

derives one that he should not enjoy both, the principle being that one shall not take any beneficial interest under a will, and at the same time set up any right or claim of his own, even if legal and well founded, which would defeat or in any way prevent the full effect and operation of every part of the will. The principle underlying the doctrine of election is not statutory, but is purely equitable, and was originally derived from the civil law, although in some states there are statutes declaratory of, or applying, the equitable principle to particular cases. The doctrine of election is generally regarded as being founded on the intention of the testator."

As early as 1859, the Supreme Court of this state, in the case of *Philleo v. Holliday et al.,* 24 Tex. 38, in discussing the doctrine of an election under a will, announced the following rule: "The principle of election is, that he who accepts a benefit under a will, must adopt the whole contents of the instrument, so far as it concerns him; conforming to its provisions, and renouncing every right inconsistent with it; as where the wife claims something under the will which will disappoint the will."

The foregoing rule has been uniformly followed by the courts of this state. *See Smith v. Butler*, 19 S.W. 1083 [(Tex. 1892).]

43.     Once a benefited party elects to accept the terms of a testamentary gift or bequest, with both its benefits and its burdens, the benefited party is estopped from contesting the provisions of any part of the will that transferred the interest.

The record reveals conclusively that plaintiff had elected to take under the terms of the will of her deceased husband and, having done so with full knowledge of its provisions, she was then estopped to attack or contest other provisions of the will naming testator's sisters as beneficiaries. Since plaintiff has, according to her own pleadings and admissions, elected to take under the will[,] she must accept its burdens as well as its benefits. *Dakan v. Dakan*, 125 Tex. 305, 83 S.W.2d 620; *Edsall v. Hutchings*, Tex. Civ. App., 143 S.W.2d 700 (writ refused); *Wright v. Wright,* 154 Tex. 138, 274 S.W.2d 670.

The rule is well stated in 97 C.J.S. Wills Sec. 1237, p. 9, in the following language:

> "The principle is that one shall not take any beneficial interest
> under a will, and at the same time reject its adverse provisions,
> or set up any right or claim of his own, even if legal and well
> founded, which would defeat or in any way prevent the full effect
> and operation of every part of the will, or that he who accepts a
> benefit under a will must adopt the whole contents of the
> instrument, conforming to all its provisions and renouncing every
> right inconsistent with it."

*Gillman v. Gillman*, 313 S.W.2d 931, 937 (Tex. Civ. App.—Amarillo 1958, writ refused n.r.e.).

44.     The University of Texas accepted the Littlefield Bequest in its entirety, which includes funds for the commission and installation of the Littlefield Fountain and its accompanying monuments on the South Mall, design and construction of the Littlefield Dormitory for Women, and the initial funds for the Main Building and the Texas Tower, etc. Will at 2-5, 20, 23, 25, 26 (Exhibit A). The University elected to accept the bequeathed funds for the construction of these campus improvements with certain burdens or conditions upon the acceptance of the funds. *Id.* The University promised not to move its main campus away from its current location for twenty-one years subsequent to Maj. Littlefield's demise, complying with an express term of the Will. 25-26 (Exhibit A). The University promised to use the Littlefield Dormitory for the housing of freshmen women, complying with an express term of the Will. 4-5 (Exhibit A). The University also promised to place the South Mall statues in a place of prominence on the South Mall, in compliance with an express term of the Will. 4 (Exhibit A).

45.     Once the University accepted the benefits of the Bequest, the University was estopped from denying any portion of the entire package of benefits and burdens.  Indeed, the University "must adopt the whole contents of the instrument, conforming to all its provisions and renouncing every right inconsistent with it." *Gillman*, 313 S.W.2d at 937.  The University not only accepted and acted upon many provisions of the Littlefield Will, but the University did so ninety-seven years ago, creating a nearly ancient pattern of plaintiffs' reliance on the University to continue its duty to care for the buildings and significant works of public art constructed from the Littlefield legacy.

46.     Without legal authority and in breach of the Littlefield Will, Defendant President Fenves has repudiated an express testamentary term, one which Maj. Littlefield plainly stated was of the greatest significance.  Will at 3 (Exhibit A).   Defendant President Fenves' knowing and willful repudiation of Maj. Littlefield's testamentary legacy to the University calls into question the integrity of the University relative to all bequests.  If the president of the flagship University of the State of Texas can publicly repudiate arguably the most significant bequest in the history of the University and of Texas, all other donors to the University are put on fair warning that the University of Texas System believes it has no duty to comply with donors' express terms of bequests or gifts.  Indeed, it is unconscionable for the University to take gifts from the living, promise performance of an

express condition of acceptance, then subsequent to the donor's demise, proudly announce to all the world that the University will ignore the binding conditions of acceptance.

47.     Where a party has been unjustly enriched, the proper remedy is restitution.  Black's Law Dictionary 1428 (9th ed.).  Maj. Littlefield entered into a relationship with the University that he would pay for the construction of buildings and monuments, so long as the University would give prominence of place on the South Mall to the five named statues, particularly to the one of Jefferson Davis.  Will at 3 (Exhibit A).  If Maj. Littlefield conferred a benefit upon the University pursuant to an agreement, the agreement is binding and enforceable by the Littlefield estate to recover the specific benefit or its value in restitution.

48.     The University violated terms of the Littlefield Bequest, through waste, neglect, and express repudiation.  The University should, therefore, disgorge the funds provided by Maj. Littlefield some ninety-seven years ago in restitution for unjust enrichment to plaintiff Steven David Littlefield of the Littlefield Estate, or the Court should order that the terms of Littlefield Bequest should be enforced:  the University be enjoined to produce the History of the United State, place a scholar in the endowed chair, agree to replace and leave unmolested all statues and structures where Maj. Littlefield, sculptor Pompeo Coppini, architect Paul Cret, and UT President Vinson intended the

public art to be, in a place of prominence on the South Mall, and to maintain all other facets of the Bequest with due care in perpetuity.

## COUNT 3 – VIOLATION OF THE
## TEXAS MONUMENT PROTECTION ACT

49.   The canons of statutory construction allow for *in pari materia* review of statutes with inconsistent provisions.  Black's Law Dictionary 862 (9th edition 2009).  The Monument Protection Act provides for two adjacent sections that define what a monument or memorial is.  Texas Government Code §§ 2166.501 and 2166.5011.   Here, two sections define which monuments or memorials are subject to statutory protection, and the two sections should be reviewed *in pari materia* to construe complete legislative intent on this issue.

50.   Section 2166.501(a) provides that monuments or memorials to "Texas heroes of the Confederate States of America or the Texas War for Independence or to commemorate another event or person of historical significance to Texans and this state" on state-owned land, private land, federal land, or on property in another state are included.

51.   Section 2166.5011(a)(1)(2) provides that a monument or memorial includes "a permanent monument, memorial, or other designation, including a statue, portrait, plaque, seal, symbol, building name, or street name, that (1) is located on state property; and (2) honors a citizen of this state for military or war-related service."

52.   A monument or memorial, as defined under these sections, may

be removed or altered only "(1) by the legislature; (2) by the Texas Historical Commission; (3) by the State Preservation Board;" or (4) for construction, repairs, or improvements to the monument or memorial.[7] *Id.* at Sec. 2166.5011(b)(1-4)(c).

53.   The six Littlefield Monuments are monuments to man of historical significance, the President of the Confederate States of America, the President of the United States during World War I, the Commander of the Army of Northern Virginia in the Civil War, the Republic of Texas Adjutant General and Commander of the Armies of Central Kentucky and Mississippi in the Civil War, the people's (arguably greatest 19th century) Governor of Texas, and a Confederate Cabinet officer and first Texas Railroad Commissioner. These Monuments are protected "monuments or memorials" as contemplated under Texas Gov't Code §§ 2166.501(a) and 5011(a)(1)(2). Two monuments are to Texas citizens for war-related service, Albert Sydney Johnson and John Reagan. These two figures enjoy double protection under this act.

54.   The Monuments are on state property, the University of Texas at Austin.

55.   The Monuments were removed by the University and not under authorization of the Texas Historical Commission, the State Preservation Board, the Texas Legislature, and not for construction or repairs.

---

[7]   The Texas Historical Commission has issued guidelines for the removal or relocation of markers or monuments.

56.   The University of Texas at Austin is not exempt from the requirements of the Texas Government Code, because the monuments were not "a project constructed by and for a state institution of higher education." Sec. 2166.003(2). To the contrary, the monuments in question were not constructed by the University but were created and sited pursuant to an agreement with and funded by Maj. Littlefield and accepted by UT.

57.   Defendant has violated the Texas Monument Protection Act. Tex. Gov't Code §§ 2166.501 and .5011. Defendant removed the Littlefield Monuments to persons of historical significance to Texans from state property.

## COUNT 4 – VIOLATION OF THE BOARD OF REGENTS' AUTHORITY OVER THE UNIVERSITY CAMPUS

58.   The University of Texas Board of Regents has vested authority and responsibility for the promulgation of rules regarding the administration of gifts, including bequests, in the Vice-Chancellor for External Relations over all campuses of the University of Texas System. UTS. R. 60101 § 2.

59.   The Vice-Chancellor for External Relations has designated the Office of Development and Gift Planning Services (ODGPS) with the administration of bequests.

> As authorized by the Board of Regents' *Rules and Regulations*, Rule 60101[,] these procedures are designed to outline administrative processes associated with the acceptance, administration, and investment of gifts processed or administered by the Office of Development and Gift Planning

Services (ODGPS), as the designee of the Vice Chancellor for External Relations in a prudent and efficient manner, with fundamental fiduciary responsibilities kept firmly in mind. These procedures also cover gifts given for current purposes, including gifts of securities, gifts of family limited partnerships, bequests, trust distributions, personal property, life insurance and retirement plan assets. UTS. R. 138 § 2.

60.     Board of Regents rules give authority and responsibility for the administration of bequests to University-of-Texas campuses to the Vice-Chancellor for External Relations, who in turn has designated the Office of Development and Gift Planning Services with the crafting and promulgation of administrative rules in this area.

61.     The University's wrongful and blatant disregard of administrative safeguards established by the Board of Regents for the protection of gifts and bequests to University-of-Texas campuses renders Defendant UT Pres. Fenves' acts in ordering the removal of the Davis and Wilson monuments ultra vires and in violation of Board of Regents rules.

62.     Texas case law provides that the President of the University of Texas does not have authority over the campus; the Board of Regents does. *Splawn v. Woodward*, 287 S.W. 667, 681 (Tex. App. — Austin, 1926) (rehearing denied). Because Pres. Fenves acted without the authority of the Board of Regents and without attempting to consult with the Board,[8] Pres. Fenves acted ultra vires.

_____

[8]     Fenves reports that he did not seek guidance from anyone with authority over the University's campus.  Gregory L. Fenves, *Message from the President [R]egarding Confederate Statues on Campus*, (August 21, 2017), http://president.utexas.edu/messages/confederate-statues-on-campus.

## F. REQUEST FOR PRELIMINARY INJUNCTION

63.    An affidavit that proves the allegations in the application for injunctive relief are attached and incorporated by reference.

64.    Plaintiffs will likely suffer irreparable injury, if the defendant is not restrained from removing the plinths to the Littlefield Statues, the Littlefield Fountain, and the George Washington Monument, as well as returning the six Littlefield Monuments and Littlefield Inscription. Fed. R. Civ. P. 65(b)(1); *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). Pres. Fenves has already removed six statues and the large inscription to the Littlefield Monument complex without notice and in the dead of night. Pres. Fenves removed these monuments to historic figures after expressly promising in his official announcements that he would not remove the remaining four statues because of the subjects' "deep ties to Texas." *President      Fenves'      Decision      on      UT      Austin      Statuary,* PRESIDENT.UTEXAS.EDU,  https://president.utexas.edu/messages/statuary (last visited September 19, 2017). Plaintiffs believe that Pres. Fenves will continue to disassemble the Littlefield Monument to American veterans, University alumni killed in action, and their families without notice, because this is his wont.

65.     Plaintiffs are currently suffering on-going irreparable injury, because the defendant has removed the Monuments and obscured the inscriptions on the plinths with black plastic to render the inscriptions unviewable. Fed. R. Civ. P. 65(b)(1); *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008).  "The loss of First Amendment interests were either threatened or in fact being impaired at the time relief was sought.  The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

66.     Pres. Fenves' covering of the Littlefield Statues' inscriptions, as well as removal of the statues and inscription directly abridges the political speech of the monuments.  Pres. Fenves argues in his message regarding Confederate statues on campus that the Littlefield monuments symbolize "hatred and bigotry."   Gregory L. Fenves, *Message from the President [R]egarding Confederate Statues on Campus,* (August 21, 2017), http://president.utexas.edu/messages/confederate-statues-on-campus.[9]   Pres. Fenves is a state actor who limited political viewpoint in public art subsidized by the University in order to communicate controversial political viewpoints. The University's silencing of political viewpoint in public art is a continuing irreparable harm, as contemplated under *Elrod v. Burns.*

---

[9]  Pres. Fenves removed the statue of Gov. Jim Hogg, who never served in the Confederacy.

67.     There is no adequate remedy at law, because any legal remedy would be merely illusory. *Northern Cal. Power Agency v. Grace Geothermal Corp.,* 469 U.S. 1306, 1306 (1984). The denial of free speech on a continuing basis cannot be readily reduced to monetary damages. The only adequate remedy to the abridgment of free speech is the injunctive demand to resume the abridged free speech.

68.     There is a substantial likelihood that the plaintiffs will prevail on the merits. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931 (1975). The University has already abridged plaintiffs' political speech communicated through Littlefield Monuments in order to substitute its own government-controlled viewpoint of political and artistic expression. Case law on this issue clearly supports the constitutional guarantee that government actors may not enforce their own political viewpoint where the government has subsidized public art for diversity of viewpoint. In addition, the claim of violation of the Texas Monument Protection Act is on all fours. The claim for breach of bequest has a substantial likelihood of success, because the terms of the bequest and the case law solidly support that the University breached its most significant donation, in order to suppress the political viewpoint that the bequest required be expressed.

69.     The on-going harm to plaintiffs outweighs the harm that a temporary restraining order would inflict on defendant. *Winter*, 555 U.S. at 24; *Yakus v. United States*, 321 U.S. 414, 440 (1944). Plaintiffs are already

experiencing continuing harm by the denial of political speech communicated by the statues and their inscriptions on the plinths. *Elrod*, 427 U.S. at 373. Defendant will suffer no harm by allowing the plinths to stand. Likewise, no harm would accrue from removing the plastic wrap or metal covers from around or over the plinths. Plaintiffs would have some cost to replace the Monuments and Inscription, but the harm to the University is at President Fenves' hands, because he failed to consider the legal consequences of denying plaintiffs their constitutional right to political viewpoint in public art. In addition, the requirement to reinstall the Monuments would send a message to all state actors that they may not deny Texans their constitutional rights to dissenting political speech subsidized in public art where diversity of opinion and expression are explicitly sought.

70.   Issuance of a temporary restraining order would not adversely effect the public interest and public policy, because issuance of the order would serve the public interest. *See Winter*, 555 U.S. at 24-26. Indeed, the benefit to third parties would be inestimable, as the freeing of the direct, factual inscriptions on the plinths, such as "James Hogg, Governor of Texas" or "Woodrow Wilson, President of the United States, Founder of the League of Nations" would allow everyone at the University know that state actors may not enforce the state's own version of history or political viewpoint where the state expressly fosters diversity of opinion. Indeed, the order would mark

the end of the Orwellian terror that Pres. Fenves is inflicting on the public, students, faculty, staff, and particularly plaintiff.

71.    Plaintiffs are willing to post a bond in the amount the Court deems appropriate.   However, plaintiffs are filing this cause in the public interest and request that the Court order no or a nominal bond.  *Kaepa, Inc., v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).  Firstly, defendant stands in no financial risk by the issuance of the requested injunction.   And secondly, plaintiffs are suing in the public interest and stand to recover no damages in this action.

72.    Plaintiffs ask the Court to set the request for a preliminary injunction hearing at the earliest possible time, and, after the hearing, to issue a preliminary injunction against defendant.

## G.  CONCLUSION

73.    Plaintiffs have proper jurisdiction and venue to appear before the Court and request injunctive relief.   Pres. Fenves has breached his promise not to alter the Littlefield Monument further by having four statues of Texas statesmen removed from the South Mall.   In removing the statues, Pres. Fenves has breached the University's long-standing promotion of American history from the Southern perspective that it promised to its generous donor, Maj. George Washington Littlefield.   In addition, Pres. Fenves has abridged plaintiffs' constitutional guarantees of political speech.

Plaintiffs are concerned that Pres. Fenves will continue to eradicate dissenting viewpoints at the University by removing the plinths. Plaintiffs are suffering continuing constitutional harm by the removal of the political speech expressed in the statues and the covering of the plinth's inscriptions. Plaintiffs have serious concerns that Pres. Fenves' Orwellian agenda will continue without intervention of this Court. For these reasons, plaintiffs ask the Court to issue a temporary restraining order preventing defendant from removing the plinths to the Littlefield Monuments, from removing the Littlefield Fountain, from removing the George Washington Monument, but to remove the plastic wrap and any other obscuring substance from the plinths of the six Littlefield statues, and to order the return of the six Littlefield Monuments and Inscription, as defined in the Littlefield Bequest and the Paul Cret Plan.

## K. PRAYER

74. For these reasons, plaintiffs ask that the Court do the following:

a. Order that Pres. Fenves not remove the plinths to the Littlefield Statues from the South Mall at the University of Texas at Austin;

b. Order that Pres. Fenves not remove the Littlefield Fountain from the South Mall at the University of Texas at Austin;

c.   Order that Pres. Fenves not remove the George Washington Monument from the South Mall at the University of Texas at Austin;

d.   Order that Pres. Fenves remove the plastic wrap and any other substances from the plinths from the six Littlefield plinths on the South Mall at the University of Texas at Austin within twenty-four hours and cease and desist from obscuring in any way the factual inscriptions on the plinths;

e.   Order that Pres. Fenves return the four statues removed in August 2017 to their plinths;

f.   Order that Pres. Fenves return the two statues removed in August 2015 to their plinths;

g.   Order that Pres. Fenves return the Littlefield Inscription, previously located west of the Fountain to its original location;

h.   Order that the University restore the South Mall Monuments as they were prior to their removal and faithfully fulfill all the terms of the Littlefield Bequest within one year of the date of order, or disgorge the entire amount of the Littlefield Bequest, including funds provided to the University, land parcels or their value,

and funds used for construction of the Main Building, the Littlefield Dormitory for Women, the Littlefield Mansion, and the Texas Tower in current value to David Steven Littlefield of the Littlefield Estate;

i.  Enter a permanent injunction against defendant that defendant must maintain and retain the Littlefield Monuments in their original locations and in perpetuity;

j.  Enter judgment for plaintiffs;

k.  Enter declaratory judgment that President Fenves abridged plaintiffs' right to free speech;

l.  Enter declaratory judgment that President Fenves breached the Littlefield Bequest;

m.  Enter declaratory judgment that President Fenves violated the Texas Monument Protection Act;

n.  Enter declaratory judgment that President Fenves violated the rules of the UT Board of Regents;

o.  Award attorney costs and fees to plaintiffs pursuant to 42 U.S.C. § 1988;

p.  Award costs of suit to plaintiffs; and,

q.      Grant any other relief the Court deems appropriate.

Respectfully submitted, this 20th day of September 2017

By: /s/ KIRK DAVID LYONS
Texas Bar No. 12743500
Federal Admission No. 8472
P.O. Box 1235
Black Mountain, N.C. 28711
E-mail kdl@slrc-csa.org
Tel. (828) 669-5189
Fax (828) 575-5290

CERTIFICATE of SERVICE

I, Kirk David Lyons, certify that on September 20, 2017, a copy of Plaintiffs'
First Amended Complaint, Request for Injunctive Relief, and Motion for
Declaratory Judgment was  emailed and electronically filed and served on the
CM/ECF system, which will automatically serve a Notice of Electronic Filing
on the following attorney in charge for defendants, according to defendants'
pleadings

_____/S/_____

KIRK DAVID LYONS

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS,
AUSTIN DIVISION

| | | |
|---|---|---|
| David McMahon, Steven Littlefield, | § | |
| And the Texas Division, | § | |
| Sons of Confederate Veterans, Inc., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 1:17:CV-0822-LY |
| | § | |
| Gregory L. Fenves, | § | |
| In His Official Capacity as | § | |
| President of | § | |
| The University of Texas at Austin, | § | |
| Defendant. | § | |
| | | |
| STATE OF NORTH CAROLINA | § | |
| | § | |
| BUNCOMBE COUNTY | § | |

## AFFIDAVIT OF KIRK DAVID LYONS

Before me, the undersigned notary, on this day personally appeared Kirk David Lyons, affiant, a person whose identity is known to me. After I administered an oath, affiant testified as follows:

1.     "My name is Kirk David Lyons. I am competent to make this affidavit. The facts stated in this complaint are within my personal knowledge and are true and correct.

2.     I have been reading news articles, talking with witnesses, and reading statements made by the parties in this matter."

KIRK DAVID LYONS

SWORN TO and SUBSCRIBED before me by Kirk David Lyons on September 20, 2017.

CHARLEEN TINSLEY
NOTARY PUBLIC
Burke County
North Carolina
My Commission Expires July 24, 2021

Notary Public in and for
The State of North Carolina