---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS,
# AUSTIN DIVISION

---

| | | |
|---|---|---|
| David McMahon, Steven Littlefield, | § | |
| And the Texas Division, | § | |
| Sons of Confederate Veterans, Inc., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 1:17:CV-0822-LY |
| | § | |
| Gregory L. Fenves, in His Individual | § | |
| Capacity as President of | § | |
| The University of Texas at Austin, | § | |
| *Defendant.* | § | |

---

## PLAINTIFFS' SECOND AMENDED COMPLAINT

---

## A. PARTIES

1.      Plaintiff, David McMahon, is an individual and a citizen of the State of Texas.

2.      Plaintiff, Steven Littlefield, is an individual and a citizen of the State of Virginia.

3.      Plaintiff, Texas Division, Sons of Confederate Veterans, Inc., is a non-profit corporation that is organized under the laws of the State of Texas.

4.      Defendant, Gregory L. Fenves, is an officer of the University of Texas at Austin and is being sued in his individual capacity.  He may be served by serving the Office of the President.  *See* Fed. R. Civ. P. 4(j)(2)(A).

## B.  JURISDICTION

5.    The Court has jurisdiction over the lawsuit, because the suit arises under Amendment I of the U.S. Constitution.  "Congress shall make no law . . . abridging the freedom of speech.". . .  28 U.S.C. § 1331.  *Gunn v. Minton*, 133 S.Ct. 1059, 1064 (2013); *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005).  Defendant's unlawful removal of the Littlefield Monuments infringed upon plaintiff Littlefield's right to free speech, as Mr. Littlefield is the successor in interest to the Littlefield estate and appears to enforce the agreement between Major Littlefield and the University to promote the political viewpoint communicated by the Monuments, agreed tp by the University, and now unlawfully terminated.

6.    The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(1), because Steven Littlefield and Gregory L. Fenves are citizens of different states and the amount in controversy exceeds $75,000.00, excluding interest and costs.  Steven Littlefield is a citizen of the State of Virgina, and Gregory L. Fenves is a citizen of the State of Texas.  In addition, the value of the Littlefield Monuments, including their plinths, at the time of the erection was over $250,000.00.  The current value of each Littlefield Statue has been estimated by an expert at the New York Landmarks Conservacy at $500,000.00 per statue, or $3,000,000.00 as a group, exclusive of the value of the Littlefield Fountain.

7.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiffs' claims to violations of the Texas Antiquities Code and defendant's causing the failure of Major Littlefield's public, charitable gifts, requiring the return of the gifts to the donor's residuary estate and successor in interest.  Plaintiffs' claims are so related to their free-speech claim within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.  Further jurisdiction is had over Plaintiffs McMahon's and Sons of Confederate Veterans' Texas-Antiquities-Code claim that defendants violated certain subsections of the code by removing the subject matter of suit.  TEX. NAT. RES. CODE ANN. § 191.173(a).  Since the state claims and the federal claim arise from the same nucleus of facts, the removal of the Littlefield Monuments and Inscription, supplemental jurisdiction over the state claims are proper.  *Exxon Mobil*, 545 U.S. at 558; *see City of Chicago v. International Coll. of Surgeons*, 522 U.S. 156, 167 (1997).

8.     This action is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, which provides redress to persons who have been deprived of their civil rights under color of state law, and under 28 U.S.C. § 1331 and § 1343(a)(3)(4).  These provisions confer jurisdiction on this Court to adjudicate violations of federal civil-rights acts and applicable provisions of the U.S. Constitution.

9.     The Court has authority to grant declaratory relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Remedies are available under 42 U.S.C. § 1983.

## C. VENUE

10.     Venue is proper in this district under 28 U.S.C. § 1391(B)(2), because all of the events or omissions giving rise to these claims occurred in this district and because all of the property at issue is situated in this district.     The Littlefield Monuments are located in this district, and defendant's actions occurred in this district.  Venue also lies under 28 U.S.C. § 1400(a), because defendant resides or may be found in this district.  Venue in this Court is further established under the Texas Antiquities Code for the reasons stated supra in the section on jurisdiction.  TEX. NAT. RES. CODE ANN. § 191.173(b).

## D. FACTS

11.     In the early morning hours of Monday, August 21, 2017, President Fenves had four statues of famous Texans removed from the South Mall of the University of Texas at Austin and their supporting plinths covered with black plastic in order to obscure their ancient inscriptions. *University of Texas Removes Four Confederate Statues Overnight*, NBC News (Aug. 21, 2017, 5:28 AM),  https://www.nbcnews.com/news/us-news/university-texas-removes-four-confederate-statues-overnight-n794411.

12.     The statues were paid for and donated to the University by Maj. George Washington Littlefield.   David B. Gracy II, *Littlefield, George Washington,* Texas State Historical Association Online (2018), https://tshaonline.org/handbook/online/articles/fli18.  The statues were part of a monument complex that Maj. Littlefield donated to the University, that the University received with great fanfare, Task Force on Historical Representation of Statuary at UT Austin (2015) at 11-13, http://diversity.utexas.edu/statues/wp-content/uploads/2016/01/Task-Force-Report-FINAL-08_09_15.pdf., and which complex President Fenves has been disassembling piecemeal since 2015.

13.     The Littlefield Bequest included the Littlefield Monuments and Fountain, funds for an endowed chair in American history, the Littlefield Fund for Southern History, a fund for the publication of a history of the United States from the Southern perspective, the Littlefield Dormitory for Women, the Littlefield Mansion, tracts of land that the University expanded into in the 1920s, the seed money for six classroom buildings, and the seed money for the Texas Tower and Administration Building.  *Littlefield; Task Force.*  The Littlefield Bequest provided the assets for the University to become a major national and international university, and George Washington Littlefield gave more money to the University than anyone else in the first fifty years of the University's existence.  *Littlefield.*  When Gov. James E. Ferguson vetoed appropriations for the University in 1917,

Littlefield offered to fund the school's operations out of his personal funds. George Washington Littlefield, https://en.wikipedia.org/wiki/George_W._Littlefield.

14.     In return for Maj. Littlefield's largess, he requested—and the University agreed—to promote the Southern perspective of American history. Task Force at 12; *Littlefield.*

15.     President Fenves' removal of the Littlefield Statues and covering of their inscriptions was a breach of Maj. Littlefield's testamentary terms.  The agreement was an exchange of substantial sums of money and real estate for the University's promotion of core political speech communicated by the Littlefield Monuments and their Inscription that promoted the Southern understanding of the Civil War.  The University agreed to communicate this political speech in perpetuity.  Now, however, Pres. Fenves has breached the University's promise and infringed on plaintiffs' constitutional right and testamentary condition to communicate political speech and had the Monuments removed.

## E.  PLAINTIFFS' CLAIMS

16.     Plaintiffs hereby incorporate their Original Complaint by reference.

I.  DEFENDANT HAS ABRIDGED PLAINTIFFS' RIGHT TO FREE
SPEECH BY REMOVING THE LITTLEFIELD STATUES AND
ATTEMPTING TO REMOVE THEIR PLINTHS.

17.    A bedrock principle of the First Amendment is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); U.S. CONST. AMEND. I.; *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 577 (1991) ("Where the government prohibits conduct *precisely because of its communicative attributes*, we hold the regulation unconstitutional.") (Scalia J., concurring).

18.    A significant exception to the right to free speech is found in the government-speech doctrine. *Pleasant Grove City, Utah, v. Summum*, 555 U.S. 460, 460 (2009).  Here, the court held that a government actor "is entitled to say what it wishes and to select the views that it wants to express." *Id.*  "The placement of a permanent monument in a public park is a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause." *Id.*   The government-speech doctrine is an absolute defense to First Amendment challenges, and an unwise one at that. *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 571 (2005) (Souter, J., dissenting).   Unchecked expansion of the government-speech doctrine threatens to erode constitutional protections by allowing viewpoint discrimination in an increasingly wide range. *Developments in the Law—*

*State Action and the Public/Private Distinction*, 123 HARV. L. REV. 1248, 1293 (2010).

19.   One significant area of exemption from the government-speech doctrine is where government funds speech through subsidies in order to promote diversity.[1]   The U.S. Supreme Court in its first government-speech case took pains to acknowledge that the government may not discriminate against government-subsidized activities solely on the basis of viewpoint. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

20.   In like manner, the government cannot make viewpoint restrictions of speech, even in unprotected forms of speech, such as libel. *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 383-84 (1992).

> [T]hese areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content.   Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government.

*R.A.V.*, 505 U.S. at 383-84.

> That would mean that a city council could enact an ordinance prohibiting only those legally obscene works that contain criticism of the city government or, indeed, that do not include endorsement of the city government.   Such a simplistic, all-or-nothing approach to First Amendment protection is at odds with common sense and with our jurisprudence as well.

---

[1]   Another exemption, the Establishment Clause, is discussed in some detail in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 460 (2009); *see* Scalia concurrence.   *See also R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, FN 4 (1992).   This exemption is not in

*R.A.V.*, 505 U.S. at 384.[2]

21.     The prohibition against viewpoint discrimination holds true for government speech in a limited public forum. *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 833 (1995). "[W]hen the State is the speaker, it may make content-based choices. . . . We recognized that[,] when the government appropriates public funds to promote a particular policy of its own[,] it is entitled to say what it wishes." *Id.* "It does not follow, however, and we did not suggest in *Widmar*, that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 834.

> [W]e reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits by observing that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to "aim at the suppression of dangerous ideas." (citations omitted).

*Rosenberger*, 515 U.S. at 834.

In other words, when the government provides subsidies to support diversity of viewpoint, the government must maintain viewpoint neutrality in the provision of such subsidies, even in speech the government adopts as its own, and especially in speech the government deems offensive.

22.     This prohibition on offensive-viewpoint discrimination serves to bar the government from skewing public debate. *Id.* at 894. (Souter, J.,

---

[2]  Justice White asserts that the prohibition against government burdening of speech content critical of government is not a First Amendment consequence, but rather a consequence of the Equal Protection Clause. *R.A.V.*, 505 U.S. at n. 4.

dissenting).  "It is precisely this element of taking sides in a public debate that identifies viewpoint discrimination and makes it the most pernicious of all distinctions based on content." *Id.* at 895.

23.    The *Rosenberger* court concerns itself with the prohibition of viewpoint discrimination in government speech in a limited public forum.  *Id.* at 819.  *National Endowment of Arts v. Finley* inquires into the prohibition of viewpoint discrimination in government speech in a government forum.  524 U.S. 569 (1998).[3]

24.    A government actor in a government forum, such as the National Endowment for the Arts (NEA), may not leverage its power to award subsidies by subjective criteria to penalize disfavored viewpoints.  *Id.* at 587-88.  Indeed, works of art are unquestionably shielded by First Amendment protection.  *Id.* at 602.  (Souter, J., dissenting).

> The constitutional protection of artistic works turns not on the political significance that may be attributable to such productions, though they may indeed comment on the political, but simply on their expressive character, which falls within a spectrum of protected speech extending outward from the core of overtly political declarations.  Put differently, art is entitled to full protections because our "cultural life," just like our native politics, "rest upon [the] ideal" of governmental viewpoint neutrality.

*National Endowment for the Arts*, 524 U.S. at 602-03.

---

[3] *Summum* does not inquire into subsidies in relation to government speech, nor into the requirement that the government may not provide subsidies to promote diversity of viewpoint in any forum and exercise viewpoint discrimination.

25.   Government may not discriminate against viewpoint, when government expends funds to encourage diversity of viewpoint from private speakers.  *Id.* at 613  (quoting *Rosenberger*, 515 U.S. at 834).  "When the government acts as patron, subsidizing expression of others, it may not prefer one lawfully stated view over another."  *Id.*

> So long as Congress chooses to subsidize expressive endeavors at large, it has no business requiring the NEA to turn down funding applications of artists and exhibitors who devote their "freedom of thought, imagination, and inquiry" to defying our tastes, our beliefs, or our values.  It may not use the NEA's purse to "suppress dangerous ideas."

*National Endowment for the Arts*, 524 U.S. at 613-14 (quoting *Regan v. Taxation with Representation for Wash.*, 461 U.S. 540, 548 (1983)).

26.   The right of free speech under the First Amendment from government control was affirmed in *Masterpiece Cakes, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. ____ (2018).   Although the court primarily addressed the Free Exercise Clause, a second and equally important issue was rights under the Free Speech Clause.  *Id.* (slip op., at 1-2).  The free-speech aspect of the case involved the symbolic message conveyed by a wedding cake and whether a government actor may limit speech it deems offensive to a protected class, even speech that is communicated as a sincerely held religious belief.  *Id.* (slip op., at 1-2, 9).  Appellant Phillips argued that the government could not compel his speech inconsistent with his religious beliefs and when communicated through artistic expression.  *Id.* (slip op., at 10-11).  The court ruled that:

> A principled rationale for the difference in treatment of these two instances cannot be based on the government's own assessment of offensiveness. Just as "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943), it is not, as the Court has repeatedly held, the role of the State or its officials to prescribe what shall be offensive. See *Matal v. Tam*, 582 U.S. ___, ___ (2017) (opinion of ALITO, J.) (slip op., at 22-23).

*Masterpiece Cakes*, 584 U.S. at ___. (slip op., at 16).

27.     Justice Thomas wrote in his partial concurrence and concurrence in the judgment that attempts by government actors to penalize expressive conduct, such as the production of an artistic wedding cake, must be able to withstand strict scrutiny. *Id.* (slip op., at 45). States cannot punish protected speech, including expressive or political speech, because someone finds it "offensive, hurtful, stigmatic, unreasonable, or undignified." *Id* (slip op., at 56).

> "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *[Texas v.] Johnson*, [491 U.S. 397, 414 (1989)]. A contrary rule would allow the government to stamp out virtually any speech at will. See *Morse v. Frederick*, 551 U.S. 393, 409 (2007) ("After all, much political and religious speech might be perceived as offensive to some"). As the Court reiterates today, "it is not the role of the State or its officials to prescribe what shall be offensive." *Ante*, at 16. "'Indeed, if it is the speaker's opinion that give offense, that consequence is a reason for according it constitutional protection.'" *Hustler Magazine, Inc., v. Falwell*, 485 U.S. 46, 55 (1988); accord, *Johnson*, *supra*, at 408-409. If the only reason a public-accomodations law regulates speech is "to produce a society free of . . . bias" against the protected groups, that purpose is "decidedly fatal" to the law's constitutionality, "for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression."

> *Hurley* [*v. Irish-American Gay, Lesbian and Bisexual Group of
> Boston, Inc.*, 515 U.S. 557, 578-579 (1995)]; see also *United
> States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813
> (2000) ("Where the designed benefit of a content-based speech
> restriction is to shield the sensibilities of listeners, the general
> rule is that the right of expression prevails").   "[A] speech
> burden based on audience reactions is simply government
> hostility . . . in a different guise."   *Matal v. Tam*, 582 U.S. ___,
> ___ (2017) (KENNEDY, J., concurring in part and concurring in
> judgment) (slip op., at 4).

*Masterpiece Cakes*, 584 U.S. at ___. (Thomas, J., concurring) (slip op.,
at 56).

29.     The University promotes diversity in public art through its

Landmarks,        Public        Art        Master        Plan        (2008).

http://landmarks.utexas.edu/sites/files/landmarks/Landmarks_Public_Art_M

aster_Plan.pdf.  The University expressly states in its Art Master Plan that

the Confederate statues and the controversial concepts they express should

remain in place in the interest of diversity.

> There is a general perception that the figurative bronze
> sculptures on campus convey difficult and sometimes
> contentious messages about diversity in the university, both in
> terms of the individuals commemorated and the locations of the
> statues within the built environment.   In particular, the
> Confederate statues on the South Mall are a source of
> controversy; their subject matter and their location are often
> invoked when issues of racial diversity and tolerance arise.
>
> This tradition of figurative bronze sculpture was followed when
> the Martin Luther King statue was added to the East Mall in
> 1999; it is located axially within the Cret Plan and oriented
> toward East Austin. . . .
>
> It has become a trend to address issues of diversity on campus
> through figurative sculpture.  There are, however, many ways to
> express the myriad beliefs and values held by university
> communities.   Future commemorative projects should be

mindful of the traditions that give rise to the production of bronze figural sculpture, and they should seek forms of artistic expression that are as diverse and relevant as the ideas they wish to convey. . . .

Public Art Master Plan at 4.

30.     The University subsidizes the public art on campus through a 1-2% budgetary earmark in capital-improvement projects.     Landmarks, https://landmarks.utexas.edu/about-landmarks.  The Confederate statues are included in the University's Public Art Master Plan.  Landmarks at 6-7; http://landmarks.utexas.edu/sites/files/landmarks/Landmarks_Public_Art_Master_Plan.pdf.

31.     The University has deemed the Confederate statues to be offensive.  President Fenves has construed the statues to "represent the subjugation of African Americans."  Confederate Statues on Campus (2015), https://president.utexas.edu/messages/confederate-statues-on-campus. Defendant has further asserted that the statues are used by white supremacists "to symbolize hatred and bigotry." *Id.*  Defendant does not identify any alleged white supremacist, nor does defendant identify any alleged acts of bigotry or hatred associated with the Monuments.

32.     The First Amendment protects persons against government burdening their freedom of speech. *Masterpiece Cakes*, 584 U.S. at ___ (slip op., 56); *National Endowment*, 524 U.S. at 616, *Simon & Schuster, Inc. v. Members of the New York State Crime Bd.*, 502 U.S. 105, 116 (1991).  The University is constitutionally enjoined from disfavoring or favoring political

viewpoints it has subsidized to promote their diversity in its public art master plan, *Id.* at 613-14; *see also Regan,* 461 U.S. at 548. Defendant established diversity of political viewpoint in public art as a core value and cannot thereafter favor or disfavor one political viewpoint over another when defendant deems a viewpoint to be offensive. On the contrary, defendant must affirmatively protect offensive viewpoints in public art. *Masterpiece Cakes*, 584 U.S. at ____ (slip op., 56) (citing Matal, 582 U.S. at ____ (slip op., 22-23)); *National Endowment*, 524 U.S. at 602-03. Indeed, the moment that President Fenves deemed the Confederate statues' artistic expression and political viewpoint to be offensive was the moment that the constitutional protections under the First Amendment arose.

33. The opinion in *Masterpiece Cakes* prevents government compulsion of speech contrary to sincerely held religious beliefs. This protection should, if it does not now, extend to the protection of political viewpoint in speech in government forums where the government has expressly sought and subsidized diversity of political or artistic viewpoint. The government must meet strict scrutiny to restrict artistic or political speech where the government, a third person, or a outside group finds the speech offensive. *Masterpiece Cakes*, 584 U.S. at ___. (slip op., at 56). Indeed, defendant's burdening plaintiffs' speech, based on public reactions, is simply a form of government hostility in another guise. *Id.* (quoting *Matal*, 582 U.S. at ___. (slip op., at 4)). The Court should hold that defendant

unconstitutionally burdened and terminated plaintiffs' continuing right to free speech, expressed through the Confederate statues and removed by defendant.    Defendant University agreed to display the Littlefield Monuments and express plaintiffs' political viewpoint in perpetuity; defendant incorporated the Monuments into its public arts program that is subsidized to promote diversity; therefore, defendant cannot thereafter burden plaintiffs' political speech merely because defendant later finds plaintiffs' viewpoint offensive.  Indeed, when defendant found the fore-agreed political viewpoint offensive was the moment defendant was required to protect plaintiffs' speech, not terminate it.

## II.  DEFENDANT VIOLATED THE TEXAS ANTIQUITIES CODE BY REMOVING THE LITTLEFIELD STATUES AND INSCRIPTION AND MUST RETURN THEM.

34.    The Texas Antiquities Code protects and preserves historic and educational sites on public and private land in the State of Texas.

> It is the public policy and in the public interest of the State of Texas to locate, protect, and preserve all sites, objects, buildings, pre-twentieth century shipwrecks, and locations of historical, archeological, educational, or scientific interest . . . in, on, or under any of the lands in the State of Texas. . . .

TEX. NAT. RES. CODE ANN. § 191.002; Op. Att'y Gen. H-250 at 2 (1974).

35.    Sites of historic interest are the sole property of the State of Texas and may not be destroyed, nor removed without a permit from the Texas Historical Commission.

> Sites, objects, buildings, artifacts, implements, and locations of historical, archeological, scientific, or educational interest . . .

that are located in, on, or under the surface of any lands belonging to the State of Texas or by any county, city, or political subdivision of the state are hereby declared to be state archeological landmarks. . . .

TEX. NAT. RES. CODE ANN. § 191.092(a); Op. Att'y Gen. H-250 at 2 (1974).

Landmarks under Section 191.091 or 191.092 of this code are the sole property of the State of Texas and may not be removed, altered, damaged, destroyed, salvaged, or excavated without a contract with or permit from the [Texas Historical Commission].

TEX. NAT. RES. CODE ANN. § 191.093; Op. Att'y Gen. H-250 at 2 (1974).

In our opinion, then, [§§ 191.092(a) and 191.093] of the Antiquities Code requires that the permission of the Antiquities Committee be obtained in the form of a permit before any site of historical or archeological interest located on public lands can be altered, damaged, destroyed, etc.

Op. Att'y Gen. H-250 at 2 (1974).

36.    Designated sites of historic interest are landmarks under the Texas Antiquities Code and entitled to protection.

In our view, the term "historic interest" under the Antiquities Code is a site which has been designated with a Texas Historical Marker, certified as worthy of preservation under section 15 of article 6145, or which is listed on the National Register pursuant to 16 U.S.C. 470a.

Op. Att'y Gen. H-620 at 5 (1974).

The Texas Administrative Code affirmed that "all landmarks are afforded some level of consideration prior to being affected by a proposed project." Sec. 26.2(2).

Section 191.0525 of the Texas Natural Resources Code requires that notice be provided to the commission before breaking ground at a project location on state or local public land. This step ensures that project effects on landmarks, whether or not

they have currently been identified, are appropriately considered.  (emphasis added).

TEX. ADMIN. CODE § 26.2(3).

37.    The Texas Antiquities Code provides for criminal penalties for violations of provisions of the chapter.

> (a) A person violating any of the provisions of this chapter is guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than $50 and not more than $1,000, by confinement in jail for not more than 30 days, or by both.
> (b) Each day of continued violation of any provision of this chapter constitutes a separate offense for which the offender may be punished.

TEX. NAT. RES. CODE ANN. § 191.171; Op. Att'y Gen. H-250 at 3 (1974).

> [W]e believe the Legislature intended to guard and protect archeological landmarks found on publicly owned property with the same vigor as those found on private land and that it intended to forbid unpermitted destruction or alteration of such landmarks by government employees or officers, as well as by private persons.

Op. Att'y Gen. H-250 at 4 (1974).

38.    The Littlefield Monuments and Inscription are protected under the Texas Antiquities Code.  The Monuments and Inscription are objects and were on a location of historical and educational interest on land belonging to a political subdivision of the State of Texas and are, therefore, a state archeological landmark.  TEX. NAT. RES. CODE ANN. § 191.092(a); Op. Att'y Gen. H-250 at 2 (1974).

39.    A state archeological landmark, as defined under sections 191.091 and 191.092 of the Texas Antiquities Code, is the sole property of the

State of Texas and may not be removed altered, damaged, destroyed, salvaged, or excavated without a contract with or permit from the Texas Historical Commission.  TEX. NAT. RES. CODE ANN. § 191.093; Op. Att'y Gen. H-250 at 2 (1974);   http://www.thc.texas.gov/preserve/projects-and-programs/state-antiquities-landmarks/antiquities-permits.  Defendant had no authority to move, nor to damage the Monuments without a prior permit or contract with the Texas Historical Commission.  *Id.*   The Littlefield Monuments are facially Texas Landmarks under the Texas Antiquities Code, even though they are not officially marked.  The Texas Administrative Code extends protections legislatively established over "landmarks, whether or not they have currently been identified.". . .  Section 26.2(3).  President Fenves could not have been unaware that the largest and oldest collection of public art in Texas was not a public landmark.  Plaintiffs have found no record, nor any application by the University for this mandatory permit.

40.    Defendant criminally violated Section 191.093 of the Texas Antiquities Code. The Littlefield Monuments are a state archeological landmark, because it is a site of historic and educational interest. TEX. NAT. RES. CODE ANN. § 191.092(a); Op. Att'y Gen. H-250 at 2 (1974).  The Monuments are a site of historical interest, because the Monuments commemorate historic events significant in the history of Texas, the Civil War and World War I.  Task Force at 11-13.  The Monuments are a site of educational interest, because they are located at the heart of the University

of Texas and commemorate men with significant influence over Texas, Woodrow Wilson, Jefferson Davis, Robert E. Lee, etc. *Id.* Since the Monuments are a historic and educational site, as well as a state archeological landmark, defendants were required to request and receive a permit from the Texas Historic Commission prior to removal of the statues and inscription. TEX. NAT. RES. CODE ANN. § 191.093; Op. Att'y Gen. H-250 at 2 (1974). Defendant's failure to seek and acquire a THC permit to remove the Monuments violated section 191.093 of the Antiquities Code and section 26.2(3) of the Administrative Code.

41.    Defendant's criminal liability for this strict-liability offense was established when he ordered, the University contracted, and the contractor removed the Monuments and the Inscription. *University of Texas Removes.*

42.    The extent of criminal liability for the defendant's unlawful removal of the protected Monuments is statutorily determined. For each offense, the penalty is a fine of between $50 and $1,000, by confinement in jail for not more than 30 days, or by both. TEX. NAT. RES. CODE ANN. § 191.171(a); Op. Att'y Gen. H-250 at 3 (1974). "Each day of continued violation of any provision of this chapter constitutes a separate offense for which the offender may be punished." TEX. NAT. RES. CODE ANN. § 191.171(b); Op. Att'y Gen. H-250 at 3 (1974).

43.    Since President Fenves removed the Monuments on August 21, 2017, approximately 314 days have passed.    Defendant committed an

unlawful action, thus stripping him of any claim to sovereign immunity and leaving him criminally liable for fines that could reach as high as $1,246,000.00 and jail time of 37,440 days for unlawfully removing the largest work of public art in Texas and a memorial to University veterans killed serving their country in time of war.  Defendant acted ultra vires in removing the Monument and Inscription.  TEX. PENAL CODE ANN. § 28.03(a).

44.   The Monument is a state archeological landmark, because it is a site, object, and historic location of historic interest and education.  TEX. NAT. RES. CODE ANN. § 191.092(a); TEX. ADMIN. CODE ANN. § 26.2(4); Op. Att'y Gen. H-250 at 2 (1974).  Texas historic landmarks are the sole property of the State of Texas.  TEX. NAT. RES. CODE ANN. § 191.093; Op. Att'y Gen. H-250 at 2 (1974).  This state's ownership interest in landmarks was established to protect them from damage and destruction by government employees and officers, such as the President of the University of Texas. *See* Op. Att'y Gen. H-250 at 4 (1974).

45.   The Texas Antiquities Code authorizes that where public officers unlawfully remove a historic object, citizen-plaintiffs may request "the return of items taken in violation of provisions of this chapter" be returned.  TEX. NAT. RES. CODE ANN. § 191.173(a).  The Court should order that defendant restore and return the Littlefield Monuments and Inscription intact to their original locations, as well as refer this case to the Texas Attorney General

and the Travis County District Attorney for criminal prosecution under the Texas Antiquities Code.

### III.  DEFENDANT HAS RENDERED THE LITTLEFIELD CHARITABLE GIFTS' PURPOSE IMPOSSIBLE AND MUST RETURN THE CHARITABLE GIFTS TO THE DONOR'S SUCCESSOR IN INTEREST.

#### A.  Plaintiff Littlefield Has Standing, Because He Has a Special Interest in the Littlefield Bequest.

46.    People who have a special interest different from that of the general public in the enforcement of a public charitable trust or gift have standing.  *Coffee v. William March Rice University*, 403 S.W.2d 340, 343 (Tex. 1966); *Tunstall v. Wormley*, 54 Tex. 476, 481-82 (Tex. 1881); *Gray v. Saint Matthews Cathedral Endowment Fund, Inc.*, 544 S.W.2d 488, 490 (Tex. Civ. App.—Texarkana 1976, no writ); Restatement (Third) of Trusts: Standing to Enforce a Trust § 94 (2012).  Special-interest standing in citizens arises from the well known history of attorney-general neglect in the enforcement of public charitable trusts and gifts.  Restatement (citing James J. Fishman, *The Faithless Fiduciary and the Quest for Charitable Accountability, 1200-2005* (2007)).

47.    The majority rule for the establishment of special-interest standing is that the plaintiff must show a present claim to benefits, as well as the donees' extraordinary measure threatening the express purpose of the gift.  *Hooker v. Edes Home*, 579 A.2d 608, 611-15 (D.C. 1990) (potential beneficiaries to home for aged and indigent had special interest where trustees' act threatened existence of trust)); *see also Family Federation for*

*World Peace v. Hyun Jin Moon*, 129 A.2d 234, 245 (D.C. 2015) (successors in interest to church founder had special interest to contest control of church); *Tunstall*, 54 Tex. at 481-82 (where trustee had only key to church and refused to allow congregation to worship in church, church members had standing to divest trustee of property); *Gray*, 544 S.W.2d at 491 (where plaintiff was parishioner, former vestryman, successor trustee, and contingently liable for debts, plaintiff had special interest in church's financial settlement that threatened endowment); Restatement.

48.     Under *Edes Home*, plaintiffs must show firstly that they are members of the class of present or potential beneficiaries, who are sharply defined and limited in number, in order to enforce a charitable trust or gift. *Id.* at 614 (citing *Alco Gravure, Inc. v. Knapp Found.*, 479 N.E.2d 752, 755 (N.Y. 1985); *see also St. John's-St. Luke Evangelical Church v. National Bank*, 283 N.W.2d 852, 858-60 (Mich. App. 1979) (citation omitted); *Gray*, 544 S.W.2d at 491. Secondly, plaintiffs must show that the trustees or donees are proposing "an extraordinary measure[,] threatening the existence of the trust[;] hence[,] raising an issue that, by its nature, could only be tried once." *Edes Home*, 579 A.2d at 614.

49.     In the instant matter, plaintiff Littlefield solidly meets the majority-view requirements for standing under the special-interest exception as defined in *Edes Home*, because he is the successor in interest to George Washington Littlefield's estate.   *Id.*   Maj. Littlefield had no children and

utilized collateral family members in the management of his business interests and as beneficiaries in his will. *Littlefield.* Plaintiff Littlefield is a direct descendant of beneficiaries of the Littlefield will and is entitled to take a portion or all of the residuary estate. TEX. EST. CODE ANN. § 101.001(3). George Washington Littlefield's descendants are small in number and an identifiable group. Plaintiff Littlefield can prove his genealogical connection to Maj. Littlefield through certified genealogical research. Plaintiff Littlefield is a member of a sharply defined and limited-in-number group, as a beneficiary or potential beneficiary of Maj. Littlefield's residuary estate.

50.     Plaintiff Littlefield meets the second prong of the *Edes Home* test, because defendant took an extraordinary measure by removing the Littlefield Monuments and Inscription. The Monuments were placed in perpetuity to commemorate American veterans of the Civil War and World War I. Landmarks at 11. The same is true of the Inscription, accompanying the Monument. *Id.* at 13. Plaintiff Littlefield has a special interest in the Monuments as a descendant of George Washington Littlefield, as a successor in interest to the Littlefield estate, and due to defendant's extraordinary measure in destroying the purpose of Maj. Littlefield's public charitable gift of commemorative art and failing to publish the history of the United States in almost a century.

51.     The minority view of special-interest standing in the courts has been to liberally grant standing to members of groups, where a serious

breach of the trust or gift is threatened and the attorney general declines to bring suit or the attorney general sides against enforcement of the public charitable gift or trust.  Restatement.  When a citizens group sued the City of Honolulu to prevent the construction of a restaurant in Kapiolani Park, wedged between Waikiki and Diamond Head, and the Attorney General sided with the City, the Hawaii Supreme Court ruled that the citizens had special-interest standing:

> Where a trustee of a public charitable trust is a governmental agency, such as the City, and that agency does not file periodic accounts of its stewardship, and will not seek instructions of the court as to its duties, even though there is a genuine controversy as to its power to enter into a particular transaction, and where, in such a case, the attorney general, as parens patriae has actively joined in supporting the alleged breach of the trust, the citizens of this State would be left without protection, or a remedy, unless we hold, as we do, that members of the public, as beneficiaries of the trust, have standing to bring the matter to the attention of the court.

> Were we to hold otherwise, the City, with the concurrence of the attorney general, would be free to dispose, by lease or deed, of all, or parts of, the trust comprising Kapiolani Park, as it chose, without the citizens of the City and State having any recourse to the courts.  Such a result is contrary to all principles of equity and shocking to the conscience of the court.

*Kapiolani Park Preservation Society v. City and County of Honolulu*, 751 P.2d 1022, 1025 (Haw. 1988).

52.    A citizens group of five sued to amend the environmental-clean-up procedure of storm damage in Baxter State Park, Maine.  *Fitzgerald v. Baxter State Park Authority*, 385 A.2d 189, 193 (Maine 1978).  This group had special-interest standing, because each person made frequent use of the

park and the attorney general was prohibited from joining suit.  *Id.* at 195.

> The subgroup of Maine people who are actual users of the Park, itself substantial in number, is sufficiently large to assure that the public's interest in administration of the Park in compliance with Governor's Baxter's [the donor's] wishes will be adequately represented.  Any citizen of Maine who shows himself to have suffered "particularized injury" as a result of action of the Baxter State Park Authority has standing to obtain judicial review and to seek injunctive relief against the proposed action.

*Fitzgerald*, 385 A.2d at 197.

53.   The Texas Legislature has also provided for liberal standing in the protection of historic landmarks and sites.  The Texas Antiquities Code provides standing to any "citizen of Texas" to bring suit for restraining orders and the return of items taken in violation of the code.  TEX. NAT. RES. CODE § 191.173(a).   Protected items include "all sites, objects, buildings, pre-twentieth century shipwrecks, and locations of historical, archeological, education, or scientific interest.". . .  *Id.* at § 191.002.  Clearly, the Littlefield Monuments are a state archeological landmark, as discussed supra. Standing to protect the Monument is statutorily provided under the Texas Antiquities Code and should also be liberally provided to those plaintiffs with a special interest in the preservation of historic monuments.  The Texas Attorney General has sided with defendant and refused to enforce Maj. Littlefield's public charitable gifts to the citizens of Texas.  This lack of legal remedy provides a powerful message to future potential donors that when any president of the University of Texas voluntarily renders the terms of a charitable gift impossible, the University and Texas Attorney General will

give no effect to the gift's terms subsequent to the benefactors' demise.  This outcome should be contrary to all principles of equity and shocking to the conscience of the Court, as well as contrary to public policy declared in the Texas Antiquities Code.

54.     Plaintiff Littlefield has special-interest standing under the majority *Edes Home* test, and Plaintiff McMahon and the Texas Division, Sons of Confederate Veterans, have standing under the minority test, due to the Texas Attorney General's decision not to enforce the terms of one of the largest public charitable gifts in the history of Texas and whose violation shocks the conscience.

## B.  Defendant Has Caused the Charitable Public Gifts to Fail and Must Return the Gifts to the Donor's Successor in Interest.

55.     Mrs. Phebe Ferris devised her estate and lands to the Peabody Museum "to be kept and held in trust by that corporation in perpetuity 'for scientific purposes for the preservation of the remains and relics of said cemetery.'"  *President and Fellows of Harvard College v. Jewett*, 11 F.2d 119, 121 (6th Cir. 1925).  The will required that the remains and relics were to be kept on site for display, on the land in Ohio.  *Id.*

56.     The Peabody Museum accepted the devise and perpetual trust, but then removed the remains and relics from Ohio and placed them in its museum in Cambridge, Mass., after Mrs. Ferris' demise.  *Id.* at 122.  The trustee of the public charitable gift made the further performance of the trust impossible by removing the trust corpus from the designated repository site

in Ohio without testamentary authority. *Id.* "[T]he plain and positive language of the devise indicates a wholly different intent and purpose [from that of the trustee], and it is the intent and purpose of the testatrix, and not the intent and purpose of the trustee or the court that must control." *Id.* (citing *Colton v. Colton*, 127 U.S. 300, 309 (1888)). "A court may not deprive this testatrix of her right to make a will by a construction wholly at variance with the plain import and the usual and ordinary meaning of the words used." *Id.*

> It does not appear from the record that, through any natural or unavoidable change in conditions or circumstances, the land devised is not now as fit and suitable for the preservation of these remains and relics as it was at the time the will was written, but rather that, by reason of the action of the trustee in removing these relics, its further use for the purpose of the trust has become unnecessary and impracticable. This presents no case for the application of the cy pres doctrine. (citations omitted).

*Jewett*, 11 F.2d at 122.

The university trustee of the public charitable gift made further performance of the trust impossible, and the trust corpus, therefore, reverted to the residuary testatrix' estate and was distributed among her beneficiaries. *Id.* at 123.

57.    In 1927, Anna Shoemaker bequeathed her residuary estate to a trustee to fund a retreat for "friendless maiden ladies" in the District of Columbia. *Shoemaker v. American Security & Trust Co.*, 163 F.2d 585, 586 (D.C. Cir. 1947).  Mrs. Shoemaker's will provided for the perpetual care of

these ladies at the retreat, which was to be erected on her property at the corner of Wisconsin Avenue and Brandywine Street, and no where else. *Id.* After almost twenty years, the trustee had still not begun construction for the retreat, and Shoemaker's beneficiaries contended that the trust had failed through the trustee's inaction and that the property reverted to them, in accordance with the reverter clause in her will. *Id.* at 587. The trial court asserted that the properties were no longer suitable for a retreat and, invoking the court's jurisdiction under cy pres, directed the trustee to sell the lots and build elsewhere. *Id.* The beneficiaries appealed. *Id.* at 588. The court of appeals ruled that:

> if a testator establishes a charitable trust and designates a site to be used, and[,] if it appears that his dominant or primary intent was the use of the designated site for the described purpose, a court cannot direct the establishment of the charity at another site. . . .
>
> [I]f the primary intent of the testator was the use of a designated property or a benefit to a designated community, the trust fails[,] if that property or the charity in the named community becomes impossible or impracticable.

*Shoemaker*, 163 F.2d at 588.

58.   In a final case, Mary Crozier bequeathed $300,000.00 to build a memorial hall to be used as a meeting and lodging place for graduates of the United States Military Academy to be named Crozier Hall in memory of her late husband, Major General William Crozier, a member of the Class of 1876. *Connecticut College v. United States*, 276 F.2d 491, 492-93 (D.C. Cir. 1960). Mrs. Crozier designated that the memorial hall be erected "on a site south of

Fort Clinton and north of the Bachelor Officers' Quarters on the general level of the Plain, in accordance with plans and specifications to be approved by the Superintendent of the United States Military Academy.". . . *Id.* at 493. Mrs. Crozier named Connecticut College the beneficiary of her residuary estate. *Id.* Three years after Crozier's death, the United States of America filed suit under the cy pres doctrine to reform Mrs. Crozier's gift "to permit the plaintiff to use the funds so bequeathed for a purpose similar to that contemplated by the testatrix.". . . *Id.* The United States averred that:

> the contemplated expansion program of the Military Academy require[s] that Fort Clinton be reserved for expansion purposes. . . . Thus, it is necessary at the present time to declare the Fort Clinton area as unavailable as contemplated by the testatrix.

*Connecticut College*, 276 F.2d at 494.

The trial court allowed the site to be changed from that designated by Crozier and also authorized the bequest funds be used for the construction of a wing on another building and not for a separate memorial hall for alumni. *Id.* at 495. The D.C. Circuit Court of Appeals reversed and remanded the trial court's decision stating that:

> The *cy pres* doctrine does not authorize or permit a court to vary the terms of a bequest and to that extent defeat the intention of the testator merely because the variation will meet the desire and suit the convenience of the trustee. . . .
>
> Nor may a trustee by his own act produce changed conditions which frustrate the donor's intention and still claim the gift through the application of the *cy pres* doctrine.

*Connecticut College*, 276 F.2d at 497.

Neither of the Government's affiants said it had become impossible or impracticable to use the site specified by Mrs. Crozier.  They merely said the Military Academy authorities, who initially approved and earmarked the site chosen by the testatrix, had later declared it unavailable because they had changed their minds by 1958 and had decided to reserve the area for another purpose. . . .

Their decision was not said to have been dictated by the occurrence of events over which they had no control.  It was due apparently to a voluntary change in policy, which may have been wise but is not shown to have been inevitable.

*Connecticut College*, 276 F.2d at 498.

Mrs. Crozier's bequest, thereupon, reverted to her residuary estate and thence to Connecticut College, the beneficiary of the residuary estate.

59.    In the instant matter, George Washington Littlefield donated the Littlefield Monuments, the six statues, the dedicatory inscription, and the fountain, as well as a substantial sum to publish a history of the United States according to the Southern perspective.  *Littlefield*.  Plaintiffs have found no record that defendant ever published Maj. Littlefield's history of the United States in almost one hundred years, presumptively pocketing the money of the decedent donor and using it for other purposes.  The University did accept and incorporate the Littlefield Monuments, along with Littlefield funds for surrounding classroom buildings and the Administration Building in the Paul Cret Plan.  Paul Phillippe Cret Drawings University of Texas, https://legacy.lib.utexas.edu/taro/utaaa/00016/aaa-00016.html.        The University has been displaying the Monuments ever since, until President Fenves decided the memorials to American war dead was offensive and then

had them removed.   No events, nor circumstances required defendant to remove the Monuments.   Defendant's actions were entirely voluntary. Defendant had no authority to substitute his own judgment, nor the judgment of his task force for the testamentary terms of Maj. Littlefield's will.  It was defendant himself and solely, who rendered the purpose of Maj. Littlefield's public charitable gift impossible by removing the Monuments and Inscription and by failing to publish the history of the United States in nearly one hundred years.

60.    Since defendant voluntarily rendered the purpose of the Maj. Littlefield's public charitable gifts impossible to fulfill, the Monuments and the fund to publish a history of the United States should revert to Maj. Littlefield's residuary estate and thence to Plaintiff Steven Littlefield. *Connecticut College*, 276 F.2d at 498; *Shoemaker*, 163 F.2d at 588; *Jewett*, 11 F.2d at 122.

## F.  ATTORNEYS' FEES AND COSTS

61.    Plaintiffs are entitled to an award of attorney fees and costs under 28 U.S.C. § 1988.

## G.  PRAYER

62.    For these reasons, plaintiffs ask that the Court do the following:

a.    Order that the plinths to the Littlefield Statues from the South Mall at the University of Texas at Austin remain in perpetuity in their current locations;

b.    Order that the Littlefield Fountain from the South Mall at the University of Texas at Austin remain in perpetuity;

c.    Order that Pres. Fenves remove the plastic wrap and any other substances from the plinths from the six Littlefield plinths on the South Mall at the University of Texas at Austin within twenty-four hours and cease and desist from obscuring in any way the factual inscriptions on the plinths;

d.    Order the return of all Littlefield Monumental Statues to their original plinths and the plinths be restored and remain in their original states as designed under the Cret Plan;

e.    Order President Fenves to publish a history of the United States according to the Southern perspective, as directed by Maj. George Washington Littlefield; or, in the alternative;

f.    Order the Monuments, the Inscription, the Plinths, and the Littlefield Fountain be transferred to Steven Littlefield;

g.    Order the Littlefield fund for the publication of a history of the United States according to the Southern

perspective, be transferred to Steven David Littlefield,

accounting for inflation and interest;

h.    Enter judgment for plaintiffs;

i.    Award attorney costs to plaintiffs;

j.    Award costs of suit to plaintiffs; and,

g.    Grant any other relief the Court deems appropriate

Respectfully submitted this 10th day of June 2018.

/s/ KIRK DAVID LYONS                /s/ David D. Vandenberg
Texas Bar No. 12743500             Mo. Bar No. 69873
P.O. Box 1235                      Admitted to No. Dist. Tex.
Black Mountain, N.C. 28711         3603D Las Colinas Drive
kdl@slrc-csa.org                   Austin, Texas 78731
Tel. (828) 669-5189               davidvandenberg@hotmail.com
Fax (828) 575-5290                 Tel. (512) 373-8694

## CERTIFICATE OF SERVICE

I certify that on July 10, 2018, a copy of Plaintiffs' Amended Complaint was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on the following attorney in charge for defendant, Gregory P. Fenves.

H. Carl Myers
Office of the Attorney General
P.O. Box 12548
Austin, Tex.  78711
Tel. (512) 475-4103
FAX (512) 320-0667
carl.myers@oag.texas.gov


s/ David D. Vandenberg

## CERTIFICATE OF CONFERENCE

I certify that I have conferred with Mr. Myers.  Defendant opposes this Plaintiffs' Second Amended Complaint.

s/ David D. Vandenberg
Attorney for Plaintiffs